The A. S. ABELL COMPANY, a body corporate, The Baltimore News-American, Division of Hearst Consolidated Publications, Inc., a body corporate, and The Daily Record Company, a body corporate,

v.

BALTIMORE TYPOGRAPHICAL UNION NO. 12 and International Typographical Union.

Civ. No. 15551.

United States District Court
D. Maryland.

June 30, 1964.

William D. Macmillan, James P. Garland, Sherbow, Shea & Doyle, Earle K.

Shawe, William J. Rosenthal, and Arthur U. Hooper, Baltimore, Md., for plaintiffs.

Jacob J. Edelman and Bernard W. Rubenstein, Baltimore, Md., for defendant Baltimore Typographical Union No. 12.

THOMSEN, Chief Judge.

This action under Section 301 of the Labor Management Relations Act, 29 U. S.C.A. § 185, to secure enforcement of the grievance procedure and arbitration provisions of the collective bargaining agreement between the parties, is before the Court on plaintiffs' motion for judgment on the pleadings. The principal question is whether the dispute is excluded from the arbitration provisions by Section 3(k) of the bargaining agreement, set out in full under "The Agreement" below.

The following facts are alleged in the complaint or appear from the exhibits attached thereto. They are admitted by the answer of the Local Union, or otherwise conceded by it.[1]

*Facts*

Plaintiffs (the Publishers) print and publish daily newspapers in Baltimore City and surrounding areas, and are corporations engaged in commerce within the meaning of 29 U.S.C.A. §§ 142 and 151. Defendant, Baltimore Typographical Union No. 12 (the Union), is the collective bargaining representative of certain employees in the composing rooms of the respective Publishers; it is a labor organization within the meaning of 29 U.S.C.A. § 152(5). On August 14, 1962, the Publishers jointly entered into a collective bargaining agreement with the Union, effective as of the date of signing and to expire on December 31, 1964.

One of the Publishers, the A. S. Abell Company (Abell), which publishes the Sunpapers, has in its composing room twelve linecasting machines capable of being operated by perforated paper tape. Most of the tape now used is produced by teletypesetter keyboard tape-perforators. Such tape requires justification and hyphenation, and the operator of each tape-perforator now does his own justification and hyphenation.

Abell also uses teletypesetter tape of financial market quotations and major league baseball box scores which it receives over the regularly leased wires of the Associated Press. Such tape is already justified and hyphenated when it is received by Abell. It is sometimes referred to as "outside tape," to distinguish it from "inside tape," produced at the plant of the particular Publisher.

Abell has recently acquired an electronic data processing computer, known as the RCA Newscom, which justifies and hyphenates tape. Abell plans to have the operators of its tape-perforators prepare unjustified and unhyphenated tape, which will be fed to the computer. The computer will perform all necessary calculations and produce a new tape, perforated in such manner that when it is fed to the linecasting machine the machine will produce hyphenated and justified columns of type.

The Union contends that under the terms of the collective bargaining agreement, specifically the second paragraph of Section 3(k), quoted below, the Publishers may not install such computers without entering into negotiations with the Union for the purpose of arriving at a mutual agreement concerning the matter.

Abell has taken the position, in which it is joined by the other publishers, that its right to install and use the computer is not subject to negotiation during the term of the current collective bargaining agreement, which expires on December 31, 1964.

A special meeting of the Union was held on April 19, 1964, at which a resolu-

---

1. The other defendant, the International Union, has filed a motion to quash service of process on it, which has not been brought to hearing. No relief against the International Union is presently sought, and the International will not be referred to again herein.

tion was adopted directing its president to

"Notify management that any change in the present typesetting operation not provided for in the contract and refused to be negotiated by management shall be considered to constitute a lockout."

Such notification was sent and on April 23, 1964 the Publishers wrote to the President of the Union as follows:

"This letter is to request a meeting with you in accordance with Sections 35 and 36 of the contract under the Code of Procedure.

"The Publishers maintain that the Union has violated the contract by the following actions against the Sunpapers:

"1. The motion passed at the special meeting of the Union on April 19, 1964, as follows:

" 'Notify management that any change in the present typesetting operation not provided for in the contract and refused to be negotiated by management shall be considered a lockout'.

"2. At a meeting on April 21, 1964 with you, Messrs. Bertsch and Becker were told that in the event management requires composing room employees to perform any of the various steps necessary for preparation of unjustified, non-hyphenated tape a work stoppage would take place immediately.

"3. Interference under threat of a work stoppage with the right of the Publisher to change the present typesetting operation."

### The Agreement

Section 3 of the collective bargaining agreement deals with the use of tape as a means of producing type in Publishers' composing rooms. It provides in pertinent part:

"*SECTION 3.* In the event any Publisher shall introduce the Teletypesetter Keyboard tape-perforator and operating units as a means of producing type in their composing rooms the following shall apply:

"(a) Both parties to this contract recognize teletypesetter or electrotypesetter (including tape box and control board) equipment, including tape perforator and recutter units, as being composing room work and within the jurisdiction of the Union and recognize the training of employees for operation of such equipment as a joint responsibility of the parties under the terms of this contract.

"(b) Teletypesetter casting units shall be tended by journeymen in the linotype operator classification. * * * "

[The remaining provisions of subsection (b) and subsections (c) to (j) contain various detailed provisions. The Court finds—so far as such a finding may be necessary for the decision of the pending motion and without intending to suggest what finding an arbitrator should make on the question—that most of the detailed provisions of subsections (b) to (j) were intended to apply to the production of tape justified and hyphenated by the perforator operators.]

"(k) Teletypesetter tape consisting of financial market quotations and Major League baseball box scores received over the regularly leased wires of The Associated Press or The United Press International may be used. All other teletypesetter tape shall be perforated by employees covered by this agreement. Machinists shall continue the present practice of maintaining machines in the composing rooms, including any additional machinery installed due to the introduction of the tape operation described above.

"In the event the Publishers, during the life of this agreement, desire to extend the use of tape not authorized by this agreement, they shall notify the Union. Upon such notification the parties shall, without undue delay, enter into negotiations for

the purpose of arriving at a mutual agreement concerning the matter, but disagreement thereon shall not be subject to the Code of Procedure or arbitration."

The Code of Procedure referred to in the second paragraph of Section 3(k) is contained in Sections 33 to 39 of the collective bargaining agreement. The material provisions thereof read as follows:

"SECTION 33. It is understood that all questions in controversy concern the contracting parties jointly and are not to be taken up for or against any individual Office or individual employee.

"SECTION 34. If any controversy arises as to interpretations or enforcement of this Agreement or the Scale of Prices attached hereto, the conditions prevailing prior to the dispute shall be maintained until the controversy has been disposed of as provided herein; * * *

"SECTION 35. When it becomes evident there is disagreement as to interpretation or enforcement of the terms of this Agreement, the aggrieved party shall address the other party in writing, clearly setting forth the matters in question. An issue is then raised. * * *

"SECTION 36. The President of the Union and the Business Managers of the newspapers, or their authorized representatives shall meet within two days from the receipt of the letter referred to in Section 35 and shall endeavor to reach an agreement within 5 days thereafter. If they shall fail to agree within five (5) days the dispute shall be immediately referred to the Joint Standing Committee, as herein provided."

[Section 37 provides for a Board of Arbitration if the Joint Standing Committee is unable to reach agreement. Section 38 is unimportant here.]

"SECTION 39. The controversies or disagreements which may be referred to the President of the Union and the Business Managers of the newspapers or their representatives or to the Joint Standing Committee, and decided in accordance with the provisions of Section 33 through 39 shall be limited exclusively and specifically to differences in the interpretation and enforcement of the terms of this contract, including the question of whether, under Section 5, the disputed issue is covered by the terms of this contract, and including the interpretation of all language contained in this contract. * * * "

Other pertinent provisions of the collective bargaining agreement are

"SECTION 5. This contract alone shall govern relations between the parties on all subjects concerning which any provision is made in this contract, and any dispute involving any such subjects shall be determined in accordance with the Code of Procedure.

"SECTION 8. The language and spirit of this Agreement guarantee the prompt and faithful performance by the Union and the Office of all obligations imposed by the terms of this Agreement. Both parties agree that whenever any differences of opinion as to the rights of either under the Agreement shall arise, or whenever any dispute as to the construction of the contract or any of its provisions takes place, such difference or dispute shall be promptly resolved in the manner provided in this contract without strike, lockout, diminution or the interruption of any kind, to the end that fruitless controversies shall be avoided, good feeling and harmonious relations be maintained, and the prosecution of the business in which the parties have a community of interest shall be assured."

### Contentions of the Parties

The Union has denied that there is any issue requiring arbitration or any meeting under the Code of Procedure, claim-

ing that the issue raised by the Publishers is excluded from arbitration and the Code of Procedure by Section 3(k) of the bargaining agreement. It argues that the provisions of Section 3(a)–(j) deal with tape which is justified and hyphenated by the operators of the tape-perforators, that the computers would make those subsections inappropriate and obsolete, and that any unjustified and unhyphenated tape prepared by such operators is included in the phrase "tape not authorized by this agreement," as that phrase is used in the second paragraph of Section 3(k).

The Publishers contend that the exclusion from the Code of Procedure or arbitration contained in the second paragraph of Section 3(k) is limited to the use of "outside tape," the kind of tape covered by the first paragraph of Section 3(k), i. e., justified and hyphenated tape similar to the financial market quotations and major league baseball box scores received over regularly leased wires of the Associated Press or the UPI. An example would be a syndicated column.

The Union contends that the exclusion embraces not only the extension of the use of such outside tape, but also and primarily the use of any and all unjustified and unhyphenated tape.

*Discussion*

■■■ The function of the Court in such a case as this is limited by the principles announced by the Supreme Court in United Steel Workers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), and United Steel Workers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

In American Manufacturing, the Supreme Court said:

"The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator." 363 U.S. at 567–568, 80 S.Ct. at 1346.

In Warrior & Gulf, the Court said:

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." 363 U.S. at 582–583, 80 S.Ct. at 1353.

The Court further stated:

"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator. 363 U.S. at 584–585, 80 S.Ct. at 1354.

These principles have been construed and applied by this Court in two recent cases: Maryland Telephone Union v. Chesapeake & Potomac Telephone Co., 187 F.Supp. 101 (1960), and Freight Drivers and Helpers Local Union 557 v. Anchor Motor Freight, 207 F.Supp. 1 (1962).

■■■ In the instant case, the Court cannot say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Nor can the Court say that the purpose to exclude from arbitration the particular type of dispute here involved is clearly spelled out. The question whether the issue is one which is

subject to arbitration is one of the questions which should be decided by the arbitrator. Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Manufacturing Company, 2 Cir., 298 F.2d 644, 645–646 (1912); Taft Broadcasting Company v. Radio Broadcast Technicians Local Union No. 253, etc., 5 Cir., 298 F.2d 707 (1962).

The Union contends, however, that this case should not be decided on a motion for judgment on the pleadings, but that the Union should have an opportunity to present evidence at a trial or affidavits on a motion for summary judgment. Counsel for the Union proffered:

(1) Evidence of the negotiations between the parties, particularly what the parties discussed when they came to write Section 3(k), in order to show what kind of tape was intended to be covered by the second paragraph thereof. Counsel stated that the parties had in mind and discussed (a) the possible use of "scanners," which use a photoelectric process rather than a keyboard to produce unjustified tape, and (b) a possible prohibition of the use of "outside tape."

(2) Evidence to make even more clear that the terms and conditions of Section 3(a)–(j) apply to tape which is justified and hyphenated by the perforator operators.

(3) Evidence to show the Union's concern with the introduction of computers, including a proposal submitted by the Union in connection therewith when the question of the use of computers was raised early in 1964, more than a year after the agreement was executed.

The decision in this case would not be altered by consideration of the proffered evidence. Even if the proffered evidence were added to the undisputed facts set out above, the Court could not say "with positive assurance" that the dispute is excluded from the operation of the very broad arbitration clause in the agreement under consideration. The Supreme Court told us in Warrior & Gulf: "Doubts should be resolved in favor of coverage." 363 U.S. at 583, 80 S.Ct. at 1353. As the Fifth Circuit said in Taft Broadcasting, supra, "courts must overcome the temptation of passing on the intrinsic merits of the controversy under the guise of determining whether the dispute is within the promise to arbitrate." 298 F.2d at 709. Moreover, it is important that such cases as this be decided promptly; when the undisputed facts show that a particular decision would be required, whether or not the proffered evidence were received, the Court should not delay the decision for further proceedings, but should carry out the spirit of the applicable statutes, as interpreted by the Supreme Court, by requiring the Union to take promptly such action as is necessary to comply with the Code of Procedure contained in the collective bargaining agreement.[2]

### Conclusion

Plaintiffs' motion for judgment on the pleadings will be granted. Counsel should agree on an appropriate decree.

---

2. In addition to the cases cited above, see United Cement, L. & G. W. I. U., A.F.L.-C.I.O., Local No. 55 v. Allentown-Portland Cement Co., E.D.Pa., 163 F.Supp. 816 (1958).